**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| **DERICO M. GOLDEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:20-cv-02805-JTF-cgc** |
| | ) | |
| **FREDDY'S FROZEN CUSTARD** | ) | |
| **& STEAKBURGERS,** | ) | |
| | ) | |
| **Defendant.** | | |

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendant FFC SEC, LLC's ("Freddy's") Motion for Summary Judgment filed on January 28, 2022. (ECF No. 38.) On March 11, 2022, Plaintiff Derico M. Golden filed a Brief, Statement of Additional Material Facts, Exhibits and a Response in Opposition to Freddy's Motion for Summary Judgment; to which Freddy's filed a Reply on March 25, 2022.[1] (ECF Nos. 43, 44.)

For the following reasons, the Court finds that Freddy's Motion for Summary Judgment should be **GRANTED**.

## I.       FACTUAL AND PROCEDURAL HISTORY

*1.  Consideration of Golden's Response, Evidence, and Additional Facts*

As a preliminary matter, Freddy's states that Golden's Response violated several of the Federal Rules of Civil Procedure and this district's Local Rules, which they argue should result in many of Golden's offered facts being "disregarded by the Court." (ECF No. 44-1, 3.)

---

[1]The Court granted Golden extra time to file a Response on February 18, 2022. (ECF Nos. 41 & 42.)

Specifically, Freddy's notes that the Response fails to conform to Fed. R. Civ. P. 56 and Local Rule 56.1 in the following ways: 1) by not separating its Additional Facts from its Memorandum in Support of Plaintiff's Response to the Defendant's Motion for Summary Judgment; 2) by exceeding the page limit for any Statements of Additional Facts; 3) by formatting the Response itself as an Answer; and 4) by not responding to each fact by either agreeing that the fact is undisputed, agreeing that the fact is undisputed for the purposes of ruling on the motion for summary judgment or showing that the fact is disputed. (ECF Nos. 44, 1-33; 44-1, 1-3.) Additionally, Freddy's argues that two documents, attached to Golden's Response as "Exhibit G" and "Exhibit H," are unsworn statements consisting of inadmissible hearsay that the Court cannot consider when ruling on the present motion. (ECF No. 44, 3.)

First, the Court agrees that Golden's Response to Defendant's Statement of Undisputed Material Facts violates Fed. R. Civ. P. 56 and Local Rule 56.1(b). Golden's Response is formatted as an Answer, with separate numbered Responses either denying or admitting some of Freddy's offered Undisputed Facts, rather than as a Response to a Statement of Undisputed Material Facts, which would list his responses directly below each fact and clarify if that fact was disputed, undisputed, or undisputed solely for purposes of the Motion, with citations to the record supporting each response. (*See* ECF No. 43-2); LR 56.1(b). Golden's Response also at points state that he can "neither admit nor deny" a fact, typically due to a lack of knowledge, or does not clarify that a fact is admitted or denied while offering additional facts. (*See, e.g., id.* at 3.) Golden does typically cite to the record when stating that a fact is "Denied." (*Id.*) While Freddy's is correct in saying that "this Court takes a dim view of Local Rule violations," in the interest of deciding the case on the merits, this Court will consider certain of Golden's offered responses despite their violation of the Local Rules. (ECF No. 44-1, 2) (citing *Nixon v. Hardin Cnty. Bd. Of*

2

*Educ.*, 988 F. Supp. 2d 826, 830 (W.D. Tenn. 2013)). Where Golden "Denies" a fact, the court will consider him to be disputing the fact, although if Golden does not cite the record for a response, it will be disregarded and the fact, as stated by Freddy's, will be considered undisputed for purposes of summary judgment.  Where Golden "Admits" a fact, the fact will be considered undisputed.

Second, the Court will disregard any of Golden's Additional Facts that exceed the page limit of Local Rule 56.1(b). Golden included many additional facts in his Memorandum in Support of Plaintiff's Response to the Defendant's Motion for Summary Judgment which were not included in his Response, obscuring and avoiding this District's five-page limit on Statements of Additional Facts. Golden did not move for excess pages before his filing, despite moving for an extension of time to file, and did not file a Statement of Additional Facts.  If allowed, Golden's actions would give him an unfair advantage in terms of the amount of factual material each side may provide.  Therefore, Freddy's request to be relieved of responding to the additional facts that exceed the page limit is Granted. (ECF No. 44-1, 16.) Accordingly, Additional Facts Nos. 61-122 will not be considered in ruling on the motion.[2]

Finally, the Court will disregard Exhibits G and H of Golden's Response. Both Exhibits appear to consist of emails, or possibly text messages, from a "Katie Fields" (Exhibit G) and a "Kiara Giles" (Exhibit H), and are framed as statements to the Court. (ECF Nos. 43-9; 43-10.) In these writings, the purported authors offer facts that support some of Golden's version of events regarding his termination and some of his accusations against other Freddy's employees. However, "a court may not consider unsworn statements when ruling on a motion for summary

---

[2] Freddy's arranged the additional facts in a properly formatted style, which, after review, the Court accepts as an accurate representation of the true length of the additional facts. (ECF No. 44-1, 3-23.) Facts 61-122 exceed the five-page limit of Local Rule 56 and will be disregarded.

judgment." *Worthy v. Mich. Bell Tele. Co.*, 472 F. App'x 342, 344 (6th Cir. 2012) (quoting *Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 239 n.1 (6th Cir. 2010)). Statements can either be sworn as affidavits "in front of an 'officer authorized to administer oaths,'" or may be submitted as declarations that are made under penalty of perjury, certified, signed, and dated. *Id.* at 343 (quoting *Peters v. Lincoln Elec. Co.*, 285 F.3d 456-475 (6th Cir. 2002); citing *Pollock v. Pollock*, 154 F.3d 601, 612 n.20 (6th Cir. 1998)). There is no evidence that either option was used for these statements. Thus, they constitute inadmissible evidence that the Court may not consider when ruling on the present motion.

With these preliminary matters of fact addressed, the Court will lay out the facts as properly presented to it.

### 2. *Factual History*

Plaintiff Derico Golden is a 49-year-old Black male who was first hired at Freddy's in October 2017 by Freddy's Operating Partner Tim Heeren. (ECF No. 38-1, 1; ECF No. 43-2, 1; ECF No. 44-1, 4.) Upon hiring, Golden was put through "new hire orientation," which included training on Freddy's internal sexual harassment policy. (ECF No. 38-1, 2.) In May 2019, Golden was promoted to General Manager by Heeren and moved from his original store in Olive Branch, Mississippi to a newly opened store in Bartlett, Tennessee. (ECF No. 38-1, 1; ECF No. 43-2, 1; ECF No. 44-1, 4.) Along with the promotion came a raise, and Golden began making $45,000 once he took over the Bartlett store. (ECF No. 44-1, 4.) As a General Manager, Golden was also entitled to compensation bonuses, typically at three or four percent of "sales on the bottom line." (ECF No. 44-1, 4.) But whenever the time for bonus disbursement came, "excuses" prevented Golden from receiving his bonus, despite his store turning a profit at every time. (*Id.*)

4

As a General Manager, Golden answered directly to Heeren. (ECF No. 38-1, 2.) Golden also joined a diverse management group.  It appears that the majority of Freddy's Memphis Area management employees are Black. (ECF No. 38-1, 2; ECF No. 43-2, 1.) His duties included supervising Assistant Managers, scheduling employees, ordering, perform weekly profit counts, training new employees, and payroll management.  He also had the authority to hire and fire employees.  (ECF No. 38-1, 2; ECF No. 44-1, 5.)

In December 2019, Golden went to Kentucky to assist with employee training sessions. (ECF No. 38-1, 2; ECF No. 44-1, 5.) After this trip, two female employees complained to Freddy's Human Resources ("HR") that Golden had made sexual comments to them while in Kentucky, specifically that he requested the women come by his hotel room, asked them to "play with his testicles," and asked them if they wanted to "hook up." (ECF No. 38-1, 2; ECF No. 38-3, 10.) Golden denied the allegations and gave Heeren names of witnesses who he claimed could corroborate that he had not sexually harassed anyone on the trip. (ECF No. 43-2, 2.) Golden also provided a statement to Freddy's Corporate Office through Heeren. (ECF No. 38-1, 3.) Freddy's Corporate Office investigated the complaints and on January 2, 2020, recommended that Golden be terminated. (ECF No. 38-1, 3; ECF No. 43-2, 2.). However, Heeren declined to terminate Golden, and instead only counseled him about the incident and reiterated Freddy's standard of conduct. (ECF No. 38-1, 3.) Golden contends that he "was told a week or two later that everything was fine." (ECF No. 44-1, 12, ECF No. 38-3, 16.)

Golden's employment proceeded without documented incident until late March/early April 2020. At this point, Quaneccia Ruffin, an Assistant Manager at a different Freddy's location who did not report to Golden, complained to Assistant Manager Robert Sharp about text messages

she had exchanged with Golden.[3] (ECF No. 38-1, 3; ECF No. 43-2, 2-3.) The relevant texts are produced in full below. It is undisputed that at some point before these messages, Golden asked Ruffin to send him a picture. (ECF No. 44-1, 14-15.) Freddy's contends that he had asked Ruffin for an inappropriate picture, while Golden contends that he asked for a picture verifying that she was out at a club, as she had allegedly called and asked him to come join her. (ECF No. 44-1, 14-15.)

> **Golden**: Nope, not that club picture, that picture you claim what i do outside of work is my business. Yeah that picture
>
> **Ruffin**: Aww naw
>
> **Golden**: Why not it's in your phone already, now you got me paranoid. I'm confused because you want a person to sweat out prem, now you acting like your slow, are bipolar
>
> **Ruffin**: lol I didn't say that u did. And what u paranoid for ? We aint did nun
>
> **Golden**: I got alot on the line, I don't need someone trying to set me up. So send the picture.
>
> **Ruffin**: Set u up mane please im too grown for all that. And i don't send those type of pics.
>
> **Golden**: Well, I'm out. I need some sort of leverage for you to keep your mouth shut. You come from Cordova, if you only knew what I heard about that store. I know about you before you came to the store.
>
> **Ruffin**: What do u know about me
>
> **Golden**: That's over dinner, if we get that far. One things for sure, is that you were not to be trusted, that's for damn sure. That's why I asked the picture.
>
> **Ruffin**: What??? Not to be trusted? And why is that? Please inform me

---

[3]The background for how this exchange began is disputed by the parties. Golden contends that Ruffin had given him her phone number, and that she initiated the conversation by calling him around midnight in December 2019, asking him to come to a club where she was at so that "she could rub her butt against his private part." (ECF No. 43-2, 2.) Ruffin and Freddy's maintain that she never gave Golden her phone number, and that he started the conversation by calling her, at which point she texted to ask who had called her. (ECF No. 38-1, 3; ECF No. 44-1, 14.) Ruffin speculated that Golden may have gotten her number from Freddy's internal hiring system but was unsure. (ECF No. 44-7, 4.)

**Golden**: Picture first. Sweat out your hair. You ain't gonna get shit, unless one of those happen

**Ruffin**: Naw u finna tell me why im not to be trusted.. if that was the case then why I still have my job

**Golden**: Oh yeah there's a reason for that one also. Babygirl we got a lot of shit to talk about.

**Ruffin**: Lol ok

**Golden**: I'll tell while we waiting on round 2. Cause looks like you not sending me photo or photos.

**Ruffin**: No u just gone tell me without all that

**Golden**: Girl please, i ain't no snitch. I'm well trained, you would have to ride that information out of me like Megan Da Stallion.

**Ruffin**: (thumbs up emoji)

**Golden**: So what that mean, you gonna send my picture or I'm gonna be interrogated soon. (unclear sentence). I need to know, if I need to make plans after 8 tonight.

**Ruffin**: Nope im not to be trusted remember

**Golden**: Hey stop being into your feelings, it was never told to me directly, i was ear dropping. So i should be mad at for hear said about me, and yet you never told me ( Do you see how that sounds). I need to know if I need to go to the bank.

**Ruffin**: Naw you don't need to go to the bank.

(ECF No. 38-5.) After Ruffin spoke to him, Sharp wrote a statement noting issues he had with Golden's job performance, as well as describing Golden's alleged "Harassment of employees…." and how Golden threatened retaliation if an employee said that "[Golden] has said something sexual about of one of the employees[.]" (ECF No. 38-3, 11.) Sharp then turned the text messages over to Human Resources Director Vanessa Jacques on April 1, 2020 and sent the statement to Tim Heeren. (ECF No. 38-1, 4; ECF No. 43-2, 3; ECF No. 38-3, 11.)

Jacques then initiated an investigation into Ruffin's allegations, as was Freddy's normal procedure. (*Id.*) Golden was placed on investigative leave on April 8, 2020, by letter. (*Id.*) That same day, Jacques received notes from Heeren about the complaints made following the Kentucky training trip and interviewed Golden and Ruffin separately. (*Id.*) In her account, Jacques states that she found her interview with Golden confusing, as she "could not get straight answers from him about the incidents, and, instead of responding to her questions, he discussed unrelated information." (ECF No. 38-1, 4.) Jacques also noted that Golden did not complain of any harassment he was facing during this interview. (*Id.*) Golden disputed this and instead states that Jacques called asking about "the fraudulent use of a credit card by one of Defendant's employees" and only brought up Ruffin's complaints later in the call. (ECF No. 43-2, 3.) Both agree that Jacques told Golden to send her "any materials he would like her to consider in the investigation," although they dispute whether a deadline was given. (ECF No. 38-1, 4; ECF No. 43-2, 3.) Regardless, Golden told Jacques to speak to a "Christopher Johnson," but Johnson did not want to get involved. (ECF No. 38-1, 5.)

During her interview, Ruffin stated that she "was not comfortable with what Golden was asking her to do, which was to send pictures of a compromising nature to him for use at a later date to influence her employment with the company." (*Id.*) Based on all the evidence, Jacques made a tentative decision to recommend that Golden be terminated but decided to give him the chance to present additional information. (*Id.*; ECF No. 43-2, 4.) Jacques received a ten-page statement from Golden on April 9, but it did not address his text messages to Ruffin. It instead accused Robert Sharp and Nakia McMichael, another Freddy's employee, of conspiring to "put some female employees up to making harassment complaints against Golden." Golden's statement did not identify Ruffin as one of the employees who was so "put up." (ECF No. 38-1,

6; ECF No. 43-2, 4.) Golden also claims, although Freddy's denies, that he was informed by another manager that he had already been terminated on April 9. (ECF No. 43-2.)

On April 10, Golden contacted a customer who was the subject of a credit card investigation at the company due to a potential unauthorized use at Golden's store. Golden told the customer that he had been fired "because the customer said Golden stole his credit card."[4] (ECF No. 38-1, 6; ECF No. 43-2, 4.) Once Jacques learned of this, she sent an email to Golden telling him to have no contact with any "parties associated with the matters you have brought to [the company's] attention[.]" (ECF No. 38-1, 6; ECF No. 43-2, 4.)

Three days later, on April 13, 2020, Jacques told Heeren that she was recommending Golden be terminated. (ECF No. 38-1, 6; ECF No. 43-2, 4.) Heeren had final decision-making authority over whether Golden would be fired. (*Id.*) Heeren decided to terminate Golden's employment after speaking with Jacques and another employee, Jamar Hodges. (ECF No. 38-1, 7; ECF No. 43-2, 4.) The decision was based on Jacques's interviews with Golden and Ruffin, the previous complaints of sexual harassment against Golden, the text messages Golden sent to Ruffin, and the statement Robert Sharp sent to Jacques when forwarding the texts. (*Id.*) Golden contends that the decision was also partly based on conversations Jacques had with Hodges. (ECF No. 43-2, 5.)  After his termination, Golden's job was first filled by Derek Markle, a 33 year old White man, but Markle was demoted after "two to three months" and replaced by Reginald Johnson, a 33 year old Black man. (ECF No. 38-1, 8; ECF No. 43-2, 5.) Golden does not necessarily deny the above facts, but says that additional context makes clear that he was the victim of unlawful employment discrimination on the basis of age and race, and that his firing

---

[4]Golden denied this fact, but seemingly only as to whether he had actually been terminated by this point. (ECF No. 43-2, 4.)

was the result of a retaliatory conspiracy for his reporting on the sexual misconduct of other employees.

Regarding age discrimination, Golden states that Robert Sharp and Jamar Hodges both made disparaging comments based on age over the course of his employment. At an unspecified time, Golden "overheard Mr. Sharp say that Freddy's is built for young people not old people, and if you were to look in Jesus's yearbook you would see a picture of Plaintiff next to Jesus[.]" (ECF No. 38-1, 8; ECF No. 43-2, 5.) In mid-2018, Golden heard Sharp comment that Golden's "body was breaking down, that's what old people do," after Golden injured his knee. (ECF No. 38-1, 9; ECF No. 43-2, 5.) In March 2020, Hodges told Golden that "Polo and Lacoste were out of style" and that old men dressed like that. (*Id.*) Hodges also told Golden that he could unload a truck faster than Golden before telling Golden that he "moved like an old man" and asking "why [Golden's] old ass [was] working for Freddy's" when it was a workplace for young people. (*Id.*) However, regarding the truck comment, Golden later stated that Hodges did not mean that Golden should step down or lose his job, instead "clarifying that the statement . . . actually consisted of 'oh, man, you're still putting up the truck.'" (*Id.*) No other employees made any age-related comments.

Regarding race discrimination, Golden states that Heeren once told him that "corporate was putting pressure on him to hire a white manager" for the Bartlett store, and proposed transferring Golden to the Collierville store "because it was not performing well." (ECF No. 38-1, 9; ECF No. 43-2, 6.) Golden declined the transfer. (*Id.*) Golden did not believe that this meant Freddy's wanted to fire him and replace him with a White manager, but instead stated he was insulted by the transfer proposal since "placing a Caucasian employee in a General Manager

position without making the Caucasian employee start from the bottom and work his way up was white privilege." (ECF No. 38-1, 10; ECF No. 43-2, 6) (internal quotation marks omitted).

Golden also states that, beginning in early 2018, he began complaining to his superiors about sexual misconduct from Sharp and Hodges that he was aware of, and that the complaints of sexual harassment against him are retaliation for his own reporting. (*Id.*) Specifically, he states that he told "Keith," a manager he reported to, that Sharp was engaging in inappropriate conversations with three employees and inviting underage employees out to restaurants to drink with him. (*Id.*) According to Golden, Sharp was "molesting boys" and Hodges "was molesting girls 16 and up."[5] (ECF No. 44-1, 6.) Golden states that he told Heeren about this behavior and even turned over a "text message to [Heeren] from a 16-year-old indicating that her and [Sharp] were going on a date."[6] (*Id.* at 7.) From there, Golden alleges that a "pattern" began: any time he reported illegal and unethical behavior of [Hodges] and [Sharp] to [Heeren]" he would be investigated.  (*Id.* at 8.) Golden also alleges that at one point, Hodges "approached him face-to-face with his fists balled up" and angrily repeated Golden's allegations back at him. (*Id.*) Golden states that the intimidation escalated, and that Hodges asked another employee to "set [Golden] up" on sexual misconduct allegations in exchange for a $10,000 raise. (*Id.* at 9-10.)

Golden filed suit on November 9, 2020, alleging that Freddy's fired him based on race and age discrimination, as well as retaliation for his internal reporting on other employees. (ECF No. 1.) Freddy's filed the present motion on January 28, 2022, arguing that summary judgment is appropriate due to Golden's failure to offer direct evidence of discrimination and failure to prove that their legitimate reason for his termination is merely a pretext. (ECF No. 38.) Golden

---

[5] Sharp and Hodges deny these allegations in separate declarations. (ECF Nos. 44-2 & 44-3.)

[6] Heeren denies that Golden ever reported these allegations or turned over text messages. (ECF No. 44-4.)

filed a response on March 11, 2022, (ECF No. 43), to which Freddy's replied on March 25, 2022. (ECF No. 44.)

## II.   <u>LEGAL STANDARD</u>

Summary Judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists when viewing the evidence in the light most favorable to the non-moving party, and construing all inferences in their favor, there is sufficient evidence for a trier of fact to find for the non-movant. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). The movant may properly support a motion for summary judgment by relying on the record and any supporting affidavits to show a lack of "genuine dispute[s], or that an adverse party cannot produce admissible evidence to support [a] fact." Fed. R. Civ. P. 56(c)(1)(B); *see also Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir. 1989).

Conversely, a genuine dispute of a material fact will allow the non-movant to survive summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, (1986). The non-movant cannot rely solely on the pleadings in opposing the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The evidence must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-movant, as the party with the burden of proof at trial, must support claims with concrete and corporeal evidence. *See Cloverdale Equip. Co. v. Simon Aerials, Inc.*, 869 F.2d 934, 937 (6th Cir. 1989). The district court does not have the duty to search the record for such evidence. *See* Fed. R. Civ. P. 56(c)(3); *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Additionally, "a nonmoving party may not avoid a properly supported motion for summary judgment by simply arguing that it relies solely or in part upon credibility considerations or

subjective evidence." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). If the evidence presented cannot "reasonably support a jury verdict in favor of the nonmoving party, the motion for summary judgment will be granted." *Id.*

## III.   LEGAL ANALYSIS

Freddy's argues that there are no genuine issues of material fact remaining in any of Golden's claims against them. Golden proceeds under two main theories: race and age discrimination under Title VII and the Age Discrimination in Employment Act ("ADEA"), and retaliation for protected activity under Title VII. The Court will address each claim in turn.

*1.  Race and Age Discrimination*

Title VII makes it unlawful for an employer to take an adverse employment action against any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race or sex.  42 U.S.C. § 2000e-2(a). The Age Discrimination in Employment Act does the same regarding an employee's age, making it unlawful to discriminate against employees 40 years of age and older based on their age. *Blizzard v. Marion Technical College*, 698 F.3d 275, 282-83 (6th Cir. 2012). Claims under both laws are evaluated under the same standards. *Roseman v. Int. Union, United Automobile, Aerospace, and Agricultural Implement Workers of America*, No. 20-2151, 2021 WL 4931959, at *4 (6th Cir. Jul. 14, 2021) (citing *Tilley v. Kalamazoo Cnty. Rd. Comm'n*, 777 F.3d 303, 307 (6th Cir. 2014)). A plaintiff must offer either direct or circumstantial evidence of discrimination from which an inference of discrimination may be drawn. *Johnson v. Kroger Co.*, 319 F.3d 858, 864–65 (6th Cir. 2003).  If direct evidence of discrimination is offered "the burden of both production and persuasion shifts to the employer to prove that it would have terminated the employee even if it had not been motivated by impermissible discrimination." *Id.* (quoting

*Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)). A plaintiff relying on circumstantial evidence of discrimination must use the burden shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and refined by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).

Freddy's argues that based on the entire record, it is entitled to summary judgment as a matter of law because: (1) Golden cannot offer at trial any direct evidence of race or age discrimination; (2) Golden cannot establish a *prima facie* case of race or age discrimination using circumstantial evidence; and (3) Golden cannot show that Freddy's reasons for disciplining and terminating Golden were pretextual. (ECF No. 38, 1-3.) Golden responds that he has presented direct evidence of discrimination, that he has made a *prima facie* case, and that he has shown the underlying reasons for his termination were pretextual and motivated by retaliation. (ECF No. 43-1, 10-18.)

    *a.   Direct Evidence*

Direct evidence of discrimination "is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 649 (6th Cir. 2012) (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)). True direct evidence "does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson*, 319 F.3d at 865; *see also Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 913-14 (6th Cir. 2013). "Only the most blatant remarks, whose intent could be nothing other than to discriminate" will qualify as direct evidence. *Scott v.*

*Potter*, 182 F. App'x 521, 526 (6th Cir. 2006). The Sixth Circuit has previously announced factors to consider when assessing whether a statement qualifies as direct evidence:

> (1) whether the statements were made by a decision-maker or by an agent within the scope of his employment; (2) whether the statements were related to the decision-making process; (3) whether the statements were more than merely vague, ambiguous or isolated remarks; and (4) whether they were made proximate in time to the act of termination.

*Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 477-78 (6th Cir. 2002).  However, the first factor may be dispositive, as the Sixth Circuit has since held that "comments made by individuals who are not involved in the decision-making process regarding the plaintiff's employment do not constitute direct evidence of discrimination." *Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003) (citing *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 433 (6th Cir. 2002))

   Golden offers numerous allegations of age discrimination through statements made by Robert Sharp and Jamar Hodges, who were also in management at Freddy's. (*See* ECF No. 43-1, 12). However, applying the above factors, none can serve as direct evidence of age discrimination. Sharp and Hodges were not decision-makers regarding Golden's employment.  The ultimate authority rested with Tim Heeren, who is not alleged to have made any age-related comments. (ECF No. 38-1, 6-7; ECF No. 43-2, 4-5.) Heeren did apparently discuss Golden's possible termination with Hodges, and Sharp had originally submitted a statement regarding Ruffin's accusations of sexual harassment, but neither are alleged to have "significantly influence[d] the decision-making process" in the necessary way. *Sharp v. Aker Plant Servs. Group, Inc.*, 726 F.3d 789, 798 (6th Cir. 2013). Even if they had, the age-related comments that Golden alleges were indisputably not related to the decision-making process, and instead consisted of a few comments admittedly made in jest at least six months before Golden's termination. *McCartt v. Kellogg USA, Inc.*, 139 F. Supp. 3d 843, 853 (E.D. Ky. 2015) (noting that "remarks over six months before the action are usually too distant" to serve as direct evidence). For example, Golden alleges that

15

Sharp, at an unspecified point in time, said that "if you were to look in Jesus's yearbook you would see a picture of [Golden] next to Jesus," but admitted that he "was not offended by it because Sharp said things to make people laugh." (ECF No. 38-1, 8-9; ECF No. 43-2, 5.) When asked if he interpreted Sharp and Hodges's spare comments as hinting that he should step down, Golden admitted that "they didn't say it in that kind of way[.]" (ECF No. 38-1, 9; ECF No. 43-2, 6.) These comments were not made by decision-makers, were unrelated to the decision-making process, were isolated remarks, and not close in time to Golden's termination. All four factors weigh against finding these comments as direct evidence of discrimination.

Regarding race discrimination, Golden offers only one statement, which he argues qualifies as direct evidence. Golden states that "he was approached by Tim [Heeren], operations partner for the defendant, and was told that he was getting pressure from his partners to have more white management. He was asked if he would be willing to take another store and allow a white male to take over his store." (ECF No. 43-1, 13.)  First, Freddy's avers that Heeren denied making the statement.  More importantly, for summary judgment purposes, Freddy's disagrees that this statement could serve as direct evidence of discrimination, "because it would require the Court to make an inference of racial animus and infer the statement equated to an intent to terminate Plaintiff to replace him with a Caucasian General Manager." (ECF No. 38-2, 6) (citing *Hardin v. J & S Restaurants, Inc.*, No. 1:10-CV-235, 2012 WL 1565352, at *9 (E.D. Tenn. May 2, 2012)).

The first factor weighs in favor of finding the comment direct evidence: Heeren was a decision-maker over Golden's employment at all relevant times. However, the second factor does not weigh in favor of finding the comment direct evidence, as the comment related to possibly transferring Golden from the Bartlett store to the Collierville store. (ECF No. 43-2, 6.) Direct evidence must be related to *the* decision-making process alleged to have been discriminatory.

*Peters*, 285 F.3d at 748 (citing *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1330 (6th Cir. 1994)). While it is unclear from the record when Heeren was alleged to have told Golden this, it was not during the investigation surrounding Golden's termination and it did not involve a threat of termination. (ECF No. 38-4, 27) (Q: ". . . you felt like that they wanted to get rid of you to put a white person in Bartlett? A: "No, that's not the case.") The third factor weighs towards direct evidence, as the comment certainly was not vague, even if it did not relate to Golden's termination. The fourth factor though is indeterminable: Golden does not provide a time for when this statement was made. Weighing all the factors together, the Court finds that this comment, while certainly concerning, does not demonstrate direct evidence of racial animus in Golden's termination given its unknown timeframe and lack of relation to the ultimate adverse action at issue. *Cf. Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524-25 (6th Cir. 2007) (removing employee from a job responsibility for being "too old" is not direct evidence of discrimination through termination, as it did not relate to termination). The Court also considers the fact that Heeren, the ultimate decisionmaker, both hired and later fired Golden.

Golden has not adequately alleged any direct evidence of discrimination. However, he argues the evidence he has presented makes a *prima facie* case of discrimination through circumstantial evidence.

 *b.   Circumstantial Evidence and Pretext*

In order to establish a *prima facie* case of discrimination, a plaintiff must prove that he: (1) is a member of a protected group; (2) was subjected to an adverse employment action; (3) was qualified for the position; and (4) was replaced by a person outside the protected class *or* treated differently from similarly situated persons outside the protected class. *McDonnell Douglas,* 411 U.S. at 802 (emphasis added). If a plaintiff establishes these preliminary elements, the burden

then shifts to the defendant to present a legitimate, non-discriminatory, and non-pretextual reason for the alleged action. (*Id.*) Thereafter, if the plaintiff can "identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination," then the matter survives summary judgment. *Provenzano v. LCI Holdings, Inc.,* 663 F.3d 806, 812 (6th Cir. 2011). However, as noted above, "a nonmoving party may not avoid a properly supported motion for summary judgment by simply arguing that it relies solely or in part upon credibility considerations or subjective evidence." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

For the sake of argument, Freddy's concedes that Golden makes a *prima facie* case. Instead, Freddy's rests their argument on Golden's alleged inability to demonstrate pretext. (ECF No. 38-2, 7.) A plaintiff may "typically show pretext in one of three ways: (1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the employer's action; or (3) that the proffered reasons were insufficient to motivate the employer's action." *Miles v. South Central Human Resource Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020) (quoting *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). The plaintiff bears the burden of persuasion throughout. *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006). This burden may be raised by the factfinder when the same person who hired the plaintiff also fired the plaintiff, under a doctrine termed the "same-actor inference." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 573 (6th Cir. 2003). The ultimate inquiry is not whether the plaintiff necessarily meets one of the above categories.  The critical question remains: "did the employer fire the employee for the stated reason or not?" *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012). Freddy's stated reason for firing Golden is that he was "engaging in inappropriate

workplace conduct that violates company policies[.]" (ECF No. 38-2, 7.) Golden argues that this reason is a pretext and that he was truly fired for reporting on Hodges and Sharp's misconduct.

Freddy's proffered reasons are well documented. Freddy's internal policies note that "[a]ll types of discriminatory harassment, including sexual harassment, are strictly prohibited." (ECF No. 38-4, 35.) Sexual harassment includes "unwelcome sexual advances, requests for sexual favors, and other verbal, non-verbal, and physical conduct based on the person's sex or gender." (*Id.*) Golden had previously been accused of making unwelcome sexual advances and comments towards two female employees. After an investigation, HR recommended Golden's termination. However, HR's recommendation was not acted upon and Golden continued working for Freddy's. (ECF No. 38-1, 2-3; ECF No. 43-2, 2.) Golden was again accused of making unwelcome sexual advances towards Ruffin, accusations supported by text messages filled with sexual innuendo and requests for pictures from a female employee. (*Id.*) An investigation of these accusations included review and consideration of the text messages between Golden and Ruffin, the prior accusations of inappropriate workplace conduct, and a statement from another coworker, Robert Sharp, which also accused Golden of making sexual comments about employees, as well as Golden's statements of denial. (ECF No. 38-3, 11.) HR recommended termination again, a recommendation which Golden's direct supervisor Tim Heeren accepted and acted upon.

The Court finds that Freddy's has offered a legitimate, non-discriminatory reason for firing Golden. *Minnis v. McDonnell Douglas Technical Servs. Co.*, 162 F. Supp. 2d 718, 735-36 (E.D. Mich. 2001) (collecting cases finding that terminating employees in response to sexual harassment allegations is legitimate and non-discriminatory). Golden's only offered theory to rebut this evidence is best viewed as an attempt to state that Freddy's reason is not the real reason

he was fired.[7] Specifically, he argues that the accusations are an attempt by Robert Sharp and Jamar Hodges to set him up for complaining about their behavior to Tim Heeren. (ECF No. 43-1, 19.)

There are several problems with Golden's argument. First, Golden does not allege that the true reason for his termination was race or age discrimination, but instead argues that accusations made against him are only personal vendettas held by two of his coworkers. Second, he offers no evidence beyond his own subjective beliefs to support his arguments. Golden states that he reported Hodges and Sharp for molesting minors numerous times and was consistently investigated or retaliated against for those reports. (ECF No. 44-1, 7-8.) It is noted that Sharp and Hodges both deny the allegations. (ECF Nos. 44-2 & 44-3.) Golden claims that he provided compromising texts and reports to Tim Heeren regarding this misconduct. However, Heeren denies ever receiving any evidence or reports of misconduct from Golden. More importantly, Golden has provided no record or evidence of submission to Heeren, or anyone else, of reported misconduct. Again, Golden has failed to produce any evidence to support his threadbare accusations. (ECF No. 44-4.)

Golden claims that the text messages showing his sexual advances towards Ruffin lack context and that "the records indicate that the conversations and messages were initiated by Ms. Ruffin." However, Golden has again failed to provide any context or previous messages he claims demonstrate his innocent motive, or Ruffin's initiating the conversation. (ECF No. 43-1, 20.) Golden claims that Hodges and Sharp attempted to pay off other employees to accuse him of

---

[7] At points in his brief, Golden also seems to imply that because Ruffin did not work under him at the time of the text messages, he could not have sexually harassed her per Freddy's policy. (ECF No. 43-1, 18-19) However, Freddy's policy does not limit its prohibitions to direct reports. (ECF No. 38-4, 35.) Further, the argument that facing unwanted sexual advances from a superior, whether they are a direct supervisor or not, does not affect one's employment is contrary to federal law. *See Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008). The argument is further undercut by Golden's text directly stating that he needed a picture of Ruffin to keep her quiet and exercise leverage over her. (ECF No. 38-5.)

sexual harassment. His testimony about the alleged payoffs is unsupported by any evidence in the record. (ECF No. 44-1, 9-10; ECF No. 44-6, 14-16.) Beyond his own subjective belief, Golden has not provided any evidence that Freddy's stated reason for firing him was not based in fact or did not actually motivate their action. He has not shown that Sharp and Hodges initiated a conspiracy against him to accuse him of sexual harassment. "Actions by nondecisionmakers cannot alone prove pretext," *EEOC v. Ford Motor Co.*, 782 F.3d 753, 768 (6th Cir. 2015), and Golden has not provided anything beyond "his pleadings and own affidavits to establish the existence of specific triable facts," which is insufficient to survive summary judgment under Sixth Circuit law. *Ashbrook v. Block*, 917 F.2d 918, 921 (6th Cir. 1990) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Golden's failure is particularly acute given that Heeren both fired and hired Golden; the same actor inference suggests that Golden would need "strong evidence of pretext to demonstrate that [Freddy's] discriminated" in firing Golden. *Garrett v. Sw. Med. Clinic*, 631 F. App'x 351, 357 (6th Cir. 2015) (quoting lower court decision and affirming).

Finally, even if Golden had shown that Sharp and Hodges set him up, Freddy's would still be protected by the Sixth Circuit's modified honest-belief approach. This protects employers where they show a "reasonable reliance on the particularized facts that were before [them] at the time the decision was made." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707-08 (6th Cir. 2006) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998)). This is true even if the decision is later shown to be "mistaken, foolish, trivial, or baseless," so long as the employee does not produce adequate proof to the contrary. *Id.* As noted above, at the time of Freddy's decision, the company had three documented accusations of sexual harassment against Golden, a letter from Robert Sharp describing more instances of sexual harassment or bad management, a prior HR recommendation of termination, and Golden's own defense, which largely addressed an

unrelated issue involving a customer credit card. There is no evidence that the process was ill considered or deficient.  (ECF No. 38-3, 17-26); *See Wright*, 455 F.3d at 709 ("Although Wright contends that Bradley had a motive to lie, this unsupported contention does not create a question of fact regarding Murray Guard's assertion that it honestly believed that Wright had sexually harassed its employees.") These processes "sufficed for [Freddy]'s to make a reasonably well informed and considered decision before terminating [Golden]." *Id.* (finding the honest belief rule warranted where an employer investigated multiple allegations of sexual harassment, conducted interviews, received reports from coworkers, and gave the accused the chance to explain themselves and offer evidence in their defense).

In light of the above, the Court finds that there are no genuine issues of material fact remaining in Golden's race and age discrimination claims. Freddy's is entitled to summary judgment on these claims.

*2. Retaliation*

Golden also brings a separate retaliation claim, specifically that circumstantial evidence shows he was retaliated against for his alleged reports against Sharp and Hodges. A *prima facie* case of retaliation under Title VII requires an employee to show "(1) he engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action."[8] *Laughlin v. City of Cleveland*, 633 F. App'x 312, 315 (6th Cir. 2015). The same standard is used under the ADEA. *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 523 (6th Cir. 2008). One type of protected

---

[8] Golden does not specify the statute that he brings his retaliation claim under, although only Title VII would be applicable to the facts, given the kind of protected activity Golden alleges.

activity comes from Title VII's "opposition clause," which protects "complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices," so long as the charges allege more than a "vague charge of discrimination" and are made "in a reasonable manner." *Jackson v. Genesee Cnty. Road Comm.*, 999 F.3d 333, 344-45 (6th Cir. 2021). The causation element requires that a plaintiff "proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007) (quoting *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997)). Temporal proximity between the protected activity and adverse action may lead to an automatic inference of causation, but only where the two are "very close in time." *Mickey*, 516 F.3d at 525. Otherwise, where some time passes, the plaintiff must present "other evidence of retaliatory conduct to establish causality." *Id.* As with traditional discrimination claims, once an employee makes a *prima facie* case of retaliation, the burden shifts to the employer to offer a "legitimate, nondiscriminatory reason for its actions," after which the burden shifts back to the plaintiff to demonstrate pretext. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008).

Golden's retaliation claim suffers the same fate as his discrimination claims. He has not provided evidence to demonstrate a genuine issue of material fact on the subject, failed to make a *prima facie* case, and failed to rebut Freddy's stated reason for firing him as pretext. It is unclear if Golden's complaints about Sharp and Hodges constitute protected activity. Assuming they are protected, Golden's argument suffers from issues with the fourth prong: causation. His first documented complaints about Sharp and Hodges came on April 9, 2020, after the disciplinary process regarding Ruffin's claim of sexual harassment had already started, in a letter sent to

Human Resources Director Vanessa Jacques.[9] Golden admits that, by this point, Jacques had already "made a tentative decision to recommend that Golden be terminated[.]"[10] (ECF No. 38-1, 5; ECF No. 43-2, 4.) The Sixth Circuit has previously found that where "the bulk of [a plaintiffs'] complaints" are made during investigation of conduct leading to termination, "any inference that the incident was used as pretext to terminate him for his complaints" is negated. *Simpson v. Vanderbilt Univ.*, 359 F. App'x 562, 571 (6th Cir. 2009). Sharp and Hodges' alleged complaints about Golden came after the disciplinary process began. Thus, Golden has failed to show that the discipline was caused by these complaints. And even if he could, Golden has failed to show that Freddy's legitimate, non-discriminatory reason for firing him was merely pretext, as discussed above. *Supra* § 1.b. Golden has not demonstrated a genuine issue of material fact regarding his retaliation claim. Freddy's is entitled to summary judgment on the claim.

## CONCLUSION

For the reasons above, Freddy's Motion for Summary Judgment is **GRANTED**, and the case is **DISMISSED** with prejudice pursuant to Fed. R. Civ. P. 56.

**IT IS SO ORDERED** on this the 5th day of October 2022.

*s/John T. Fowlkes, Jr.*
JOHN T. FOWLKES, JR.
UNITED STATES DISTRICT JUDGE

---

[9] Golden argues that he was complaining to Tim Heeren about Sharp and Hodges long before this, but as discussed above, he offered no evidence of these complaints, and all relevant parties deny that he made these complaints before April 9.

[10] Golden actually contends that the decision to terminate him had been made *before* he first raised his complaints about Sharp and Hodges with HR.  However, since he does not provide facts supporting this timeline, the Court does not credit it. (ECF No. 43-2, 4) ("Mr. Golden had been informed by a manager of defendant that his employment had been terminated as of April 8.").